**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-2432
_____

| | |
|---|---|
| Karl Roberts, | * |
| | * |
| Plaintiff/Appellee, | * |
| | * |
| v. | * |
| | * |
| Unidynamics Corporation, a Missouri | * |
| Corporation; doing business as | * |
| Crane National Vendor, | * |
| | * Appeals from the United States |
| Defendant, | * District Court for the |
| | * Eastern District of Missouri. |
| District No. 9 International Association | * |
| of Machinists and Aerospace Workers, | * |
| | * |
| Defendant/Appellant. | * |

_____

No. 96-2437
_____

| | |
|---|---|
| Karl Roberts, | * |
| | * |
| Plaintiff/Appellee, | * |
| | * |
| v. | * |
| | * |
| Unidynamics Corporation, a Missouri | * |
| Corporation; doing business as | * |

Crane National Vendor,                          *
                                                *
            Defendant/Appellant,                *
                                                *
District No. 9 International Association         *
of Machinists and Aerospace Workers,            *
                                                *
            Defendant/Appellee.                 *

                    _____

                No. 96-2440
                    _____

Karl Roberts,                                   *
                                                *
            Plaintiff/Appellant,                *
                                                *
        v.                                      *
                                                *
Unidynamics Corporation, a Missouri             *
Corporation, doing business as                  *
Crane National Vendor; District No. 9           *
International Association of Machinists          *
and Aerospace Workers,                          *
                                                *
            Defendants/Appellees.               *

                    _____

                No. 96-3445
                    _____

Karl Roberts,                                   *
                                                *
            Plaintiff/Appellee,                 *
                                                *

v.                                              *
                                                *
Unidynamics Corporation, doing                  *
business as Crane National Vendor, a            *
Missouri Corporation; District No. 9            *
International Association of Machinists          *
and Aerospace Workers,                          *
                                                *
        Defendants/Appellants.         *

_____

Submitted:  June 11, 1997

Filed:  October 6, 1997
_____

Before WOLLMAN, Circuit Judge, HENLEY, Senior Circuit Judge, and BEEZER,[1]
    Circuit Judge.

_____

WOLLMAN, Circuit Judge.

        Unidynamics Corporation, which does business as Crane National Vendors
(Crane), and District No. 9 International Association of Machinists and Aerospace
Workers (the union), appeal from the judgment entered on the jury's verdict in favor
of Karl Roberts.  Roberts' suit is based on his claim that Crane and the union regarded
him as carrying the human immunodeficiency virus (HIV) or having Acquired Immune
Deficiency Syndrome (AIDS) and discriminated against him because of that perception.
Roberts cross-appeals on several issues.  We reverse the judgment and dismiss the
cross-appeal as moot.

_____

[1]The HONORABLE ROBERT R. BEEZER, United States Circuit Judge for the
Ninth Circuit, sitting by designation.

# I.

Roberts began working in 1989 as a welder at Crane, a company that manufactures such items as vending machines and elevators. He continued to work in the weld department until his termination in 1992, except for a brief period of time during which he worked in the paint department. In the spring of 1992, Roberts began experiencing weight loss, eye irritation, tremors, weakness, and diarrhea. Roberts' supervisor in the weld department, Dennis Blake, believed that Roberts might have an eye infection and advised him to see a physician. Roberts followed Blake's advice and, in June of 1992, was diagnosed as having Graves' disease.[2] Roberts reported the diagnosis to Blake. Blake did not request documentation of Roberts' diagnosis, but did ask whether it would interfere with Roberts' ability to perform his job. Roberts replied that it would not.

Roberts' physical condition was also observed by his co-workers. Several stated at trial that they had noticed a change in Roberts' appearance in that he had lost a great deal of weight, that he looked gaunt and sickly, and that his eyes "kind of bulged" or "bugged out."

On September 30, 1992, Roberts was at Blake's desk writing a note to a co-worker during a break. Blake approached him and requested to see the note. Roberts told Blake the note was private and refused to give it to him. Roberts testified that

---

[2]Graves' disease is "a disorder of the thyroid of unknown but probably autoimmune etiology . . . ." The Sloane-Dorland Annotated Medical-Legal Dictionary, p. 182 (1992 Supplement).

Roberts' treating physician testified that the classic signs of Graves' disease "are diffuse generalized enlargement of your thyroid or goiter along with weight loss, tremor, fast heart rate or palpations, history of diarrhea, history of itching. Sometimes the patients will have eyes that are bulging and that's a classic sign of Graves' Disease or hyperthyroidism."

-4-

Blake continued to demand to see the note and that Roberts refused to permit him to do so. Roberts stated that he walked to his work station and that Blake "was right behind [him], kind of hounding [him] about it." When Roberts arrived at his work station, Blake "gave [him] a direct order" and stated, "I want to see the note." Roberts responded, "No, it's private and I don't think I have to show it to you." After Blake gave him another direct order to hand over the note, Roberts demanded that L.C. Monehan, the shop steward, be called over to resolve the dispute.

Monehan told Roberts to show Blake the note, whereupon Roberts did so. After Blake read the note, which read, "Charlie [a co-worker], this is Catfish, are you mad at me?", he said that Roberts' behavior was childish and a waste of time and informed Roberts that he was on notice and that if such behavior continued he, Blake, would take further action.

On October 5, 1992, Blake noticed an empty welding-wire spool, approximately eight to twelve inches long and four inches wide, lying on the floor near the big cabinet line where Roberts was stationed. He asked Roberts if the spool was his. Roberts replied, "I'm assuming that since I just got to this work station I know it's not mine." Blake then asked Roberts if he knew whose it was, to which Roberts replied that he did not. Blake said, "Well, pick it up." Roberts replied, "Okay," but made no attempt to look for or pick up the spool.

The following day, Roberts was stationed on the small cabinet line. At the end of Roberts' eight-hour shift, Blake asked him if he would be willing to work overtime. Roberts agreed and was moved to the big cabinet line. After Roberts had been working for about 25 minutes, Blake approached him and said, "I thought I told you to pick up a spool." Roberts retorted, "You didn't tell me to pick up the spool." Blake said, "Pick it up, that's an order," to which Roberts replied, "I really don't appreciate the way you said that." Blake said, "Well, pick it up." Roberts said "Okay," but resumed

welding. Blake repeated his order and Roberts replied, "I heard you," but continued to weld.

Blake contacted Kay Merz, Crane's human resource manager and described Roberts' conduct. Merz agreed that Roberts' conduct was "blatant insubordination" and suggested Roberts be suspended pending further investigation. Blake then contacted Ron Wilson, general production supervisor, who agreed with Merz's recommendation. Blake and Wilson notified Monehan, and the three approached Roberts. Wilson said to Roberts, "I hear that you're refusing a direct order from your supervisor by not picking up a spool." Roberts explained that he could not find the spool, and Wilson told him he was suspended pending further investigation. Roberts then said, "Ron, what am I supposed to do, show this guy the color underwear I got on if he asks me?"

Blake prepared a memorandum documenting the incident, which was submitted to Edwin Barutio, Crane's vice president of human resources. Barutio conducted an investigation of the incident and concluded that Roberts should be terminated. Barutio testified that he came to this conclusion because Roberts had engaged in several acts of insubordination within a short period of time, the incidents were highly visible to other employees, and Roberts had demonstrated a "cavalier" attitude.

Immediately following his suspension, Monehan advised Roberts to file a grievance. Roberts waived the first and second grievance steps, and the case proceeded to a third step grievance meeting. At the third step meeting, Barutio, Wilson, Blake, and Merz represented Crane. Business representative Bob Soutier, Monehan, and shop steward Al Bohmer represented the union. Roberts was also in attendance. Roberts testified that just prior to the meeting he informed Monehan and Soutier that James Woolsey was a witness to the spool incident and that he should be called. Woolsey was not contacted, however. During a break in the meeting, Soutier

told Roberts to apologize and ask for his job back. Roberts then apologized to the Crane officials for "any inconvenience" he may have caused.

At the conclusion of the meeting, Soutier asked that Roberts be reinstated. Monehan suggested to Barutio that Roberts receive a disciplinary layoff rather than termination. Barutio denied the grievance and terminated Roberts. The union decided not to process Roberts' grievance for lack of merit. Soutier, who made the decision not to pursue the grievance, explained that he believed Blake's requests of Roberts were reasonable, that Roberts' acts of insubordination had occurred over a short period of time, and that he did not believe that Roberts had merely forgotten to pick up the spool on October 5 as Roberts testified to at trial.

On November 23, 1992, Roberts wrote to Jim Bagwell, Directing Business Representative of District 9, complaining that Soutier had failed to investigate his grievance or to make a statement on his behalf at the hearing. Roberts did not indicate that he believed that either Crane or the union had discriminated against him. On March 15, 1993, Roberts filed a complaint with the Equal Employment Opportunity Commission (EEOC) and the Missouri Commission on Human Rights (MCHR) alleging that he had been discharged because of a "handicap/perceived handicap (Graves Disease)." The EEOC and MCHR notified Roberts of his right to sue, and Roberts filed suit against Crane and the union under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and the Missouri Human Rights Act (MHRA), Mo. Rev. Stat. § 213.010 et seq., alleging that Crane had terminated him and the union had failed to investigate and pursue arbitration of his grievance because of his actual and/or perceived disabilities.[3] Following the jury's verdict in favor of Roberts, the

---

[3]The district court granted summary judgment in favor of Crane and the union on Roberts' claims of discrimination based on actual disabilities, a ruling that Roberts does not contest on appeal.

district court denied Crane's and the union's motions for judgment as a matter of law or a new trial.

## II.

We review the district court's denial of a motion for judgment as a matter of law de novo, applying the same standard as the district court. See Triton Corp. v. Hardrives, Inc., 85 F.3d 343, 345 (8th Cir. 1996). "[W]e will not reverse a jury's verdict for insufficient evidence unless, after viewing the evidence in the light most favorable to the verdict, we conclude that no reasonable juror could have returned a verdict for the non-moving party." Ryther v. KARE 11, 108 F.3d 832, 836 (8th Cir. 1997) (en banc), cert. denied, 117 S. Ct. 2510 (1997). Although we accord Roberts the benefit of reasonable inferences, "inferences must be more than speculation or conjecture to be reasonable." Day v. Johnson, No. 95-4024, slip op. at 6-7 (8th Cir. Jul. 10, 1997).

In order to establish a prima facie claim of a perceived disability under the ADA, Roberts must show that each defendant "'regarded [him] as having' an impairment that 'substantially limits' a 'major life activit[y].'" Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir. 1995) (quoting 42 U.S.C. § 12102(2)(C)). A defendant cannot be liable for discharging an employee unless it regarded the plaintiff as having a disability. See Webb v. Mercy Hospital, 102 F.3d 958, 960 (8th Cir. 1996); Hedberg v. Indiana Bell Tel. Co., Inc., 47 F.3d 928, 932 (7th Cir. 1995). See also Gerdes v. Swift-Eckrich, Inc., No. 97-1006, slip op. (8th Cir. Sept. 11, 1997). An individual is regarded as having a substantially limiting impairment when others treat that individual as having such an impairment. See Webb, 102 F.3d at 960. Similarly, under the MHRA, Roberts must establish that the defendant regarded his condition as substantially impairing his life activities. See Mo. Rev. Stat. § 213.010(10); Lorenz v. Filtronetics, Inc. (In re Estate of Latimer), 913 S.W.2d 51, 56 (Mo. Ct. App. 1995).

-8-

## A. Crane

Crane argues that the evidence was insufficient to support the jury's conclusion that Crane regarded Roberts as having HIV or AIDS. We agree. Roberts emphasizes his appearance as pivotal in Crane's perception of him, but the fact that several co-workers testified to their observations of Roberts' physical condition is insufficient to permit an inference that Roberts' supervisors regarded him as having HIV or AIDS.

Likewise, there is no substantial evidence that Roberts' co-workers regarded him as having AIDS. A paint department employee testified that a co-worker told him not to use Roberts' respirator because Roberts "might have AIDS or something." No one else was present when the comment was made. Two other employees stated that a co-worker mentioned that Roberts might have AIDS. One of the two testified that Blake, although several feet away when the comment was made, gave no indication that he had heard the alleged comment. In addition, this witness stated that the comment was made in a joking manner. All three of these co-workers testified that they did not repeat the alleged comments and knew of no evidence suggesting that the speaker had made similar comments to anyone else. Furthermore, of the nine co-workers who testified for Roberts, only one testified that he believed Roberts had HIV or AIDS.

Roberts has failed to link the alleged rumors to Crane decisionmakers. He admitted at trial that none of the comments he believes support his disability discrimination claim were made by or to company officials. His unsupported speculation that Crane officials heard such rumors is simply insufficient to permit a reasonable jury to find for him on the issue of Crane's knowledge of those rumors. See Hedberg, 47 F.3d at 932.[4]

---

[4]Roberts emphasizes that Barutio testified that he had heard rumors that three Crane employees were HIV positive or had AIDS. Barutio testified, however, that Roberts was not one of those individuals, that two of the employees had passed away, and the third remained employed at Crane at the time of trial.

Roberts asserts that Blake told him in July or August of 1992 that he was a liability to the company and that he should find a new job.[5] Assuming that such a statement was made, it fails to show that Blake regarded Roberts has having HIV or AIDS. The statement itself does not evince any discriminatory animus toward Roberts. See Aucutt, 85 F.3d at 1316. Roberts admitted that he and Blake were not discussing his physical condition when Blake made the alleged statement and that Blake said or did nothing to indicate that it related to a perception that Roberts had HIV or AIDS. Roberts admitted that at the time Blake made the alleged comment he, Roberts, "blew it off like a joke." Moreover, Roberts had informed Blake that his symptoms were due to Graves' disease, adduced no evidence showing that Blake disbelieved this explanation, and admitted that his belief that Blake's alleged statement related to HIV or AIDS was merely speculation.

Roberts submitted no other evidence sufficient to support a finding that any Crane decisionmaker believed that Roberts had HIV or AIDS. In fact, Roberts acknowledged that at the time of his discharge he did not believe that he had suffered discrimination and admitted that he subsequently learned of no evidence to support his claim that Crane perceived him as having HIV or AIDS.

Even had he succeeded in showing that Crane regarded him as disabled, Roberts' claim would fail, for he has not adduced any evidence that would permit an inference that he was terminated because of his disability. See Webb, 102 F.3d at 960; Price v. S-B Power Tool, 75 F.3d 362, 365 (8th Cir.), cert. denied, 117 S. Ct. 274 (1996); Miners v. Cargill Communications, Inc., 113 F.3d 820, 824 (8th Cir. 1997) (evidence sufficient to show employee was terminated because of disability); Lorenz, 913 S.W.2d at 55. Roberts argues that the spool incident was a "set up" and that he

---

[5]Roberts alleges that Blake made this statement "after hearing rumors that [Roberts] had AIDS." There is no evidence, however, that Blake ever heard rumors that Roberts had AIDS.

-10-

"was suspended for failing to pick up a spool that nobody could find, not even Blake." He offered no evidence suggesting that the spool was hidden, however, other than his own claim that although he looked for the spool on October 6 he could not find it. His testimony was contradicted by testimony of his co-workers James Woolsey and Gary Inness, both of whom testified that Roberts did not even attempt to look for the spool. Moreover, Woolsey attested that he was able to locate the spool after looking for approximately five minutes, testimony corroborated by Inness.[6]

Roberts also asserts that the discipline meted out to him was different from that imposed upon other employees and argues that the treatment he received shows that discrimination was the cause of his termination. The record does not reveal, however, that the other employees cited for insubordination were similarly situated. Barutio's testimony was that the discipline an employee receives depends upon factors such as the employee's seniority and the nature of the insubordination. Barutio believed that Roberts' acts merited termination because they occurred within several days of each other and were highly visible on the production floor. Although one other employee who had committed several acts of insubordination within several days received a disciplinary lay-off rather than termination, Roberts neither offered any evidence of that employee's seniority nor showed that the employee's acts were similarly visible. Still another employee was not discharged for insubordination until he had engaged in acts more insubordinate than Roberts'. Those acts were separated by intervals of at least several months, however, and the record does not reveal that employee's seniority or the visibility of his insubordinate acts. Although Roberts may have had reason to

_____

[6]As further evidence of a "set-up," Roberts argues that because the memorandum Blake prepared for Roberts' personnel file is captioned "Termination," the jury could infer that Crane knew on the date of his suspension that Roberts would be terminated. Blake, however, testified that he hand-wrote the memorandum and that the secretary who typed the memorandum presumably added the caption. Barutio corroborated Blake's testimony, testifying that he received a copy of Blake's handwritten memorandum and that it did not contain the caption.

believe that his termination was a sanction disproportionate to the conduct that precipitated it, the degree of discipline was a matter committed to Crane's discretion. So long as the exercise of that discretion was not motivated by an unlawful consideration, it is beyond our power to review it.

We conclude that the evidence, viewed in the light most favorable to Roberts, establishes only that Roberts was terminated because he failed to follow his supervisor's orders. Accordingly, the district court should have granted Crane's motion for judgment as a matter of law.

## B. The Union

The union argues that the evidence is insufficient to support the jury's conclusion that the union refused to investigate Roberts' grievance and pursue his claim to arbitration because it perceived him as having HIV or AIDS. We agree. It is undisputed that Soutier, who was responsible for determining whether Roberts' grievance should be pursued to arbitration, had not met Roberts before the third step hearing and thus did not have first-hand knowledge of Roberts' physical condition. Soutier denied ever hearing rumors that Roberts had HIV or AIDS, and Roberts introduced no evidence suggesting that Soutier held such a perception.

Roberts alleges that "it is undisputed that the shop steward, [Monehan] . . . clearly had knowledge of Plaintiff's perceived disability." Roberts failed, however, to show that Monehan was a decisionmaker involved in the union's decision not to arbitrate. Monehan's involvement in the grievance process consisted of suggesting to Roberts that he file a grievance, requesting that Barutio give Roberts a disciplinary layoff in lieu of termination, and attending the hearing. Roberts produced no evidence showing that Monehan played any role in the decision not to arbitrate Roberts' grievance, and any alleged perception on his part is therefore insufficient to support an inference of discrimination by the union. See Herrero v. St. Louis University Hospital,

109 F.3d 481, 484 (8th Cir. 1997); <u>Bradford v. Norfolk Southern Corp.</u>, 54 F.3d 1412, 1421 (8th Cir. 1995).

Even if Monehan could be considered a union decisionmaker, Roberts' evidence is insufficient to support his contention that Monehan "clearly had knowledge of Plaintiff's disability." Roberts points out that when Monehan was asked at trial how he had recalled Roberts' physical description during his deposition, Monehan replied, "I think what I told you that what I had seen on a person that would been [sic] ill in the effect of HIV virus that it was someone real skinny and dried up like you see on TV." Even construing this less-than-clear statement as indicating that Monehan thought that Roberts physically resembled someone with HIV, his belief that Roberts exhibited symptoms which might be associated with HIV does not necessarily show that he believed Roberts had HIV. <u>See</u> <u>Webb</u>, 102 F.3d at 960; <u>Aucutt</u>, 85 F.3d at 1319. Roberts offered no evidence showing that Monehan's statement, if construed to relate specifically to Roberts, was more than an observation of Roberts' appearance. Roberts asserts that Monehan was nearby when a co-worker made a joke suggesting that Roberts had AIDS, but his two-tiered assumption that Monehan might have heard the joke and that hearing such a joke caused him to believe Roberts had HIV or AIDS is mere speculation insufficient to support a finding of discrimination. <u>See</u> <u>Hedberg</u>, 47 F.3d at 932.

The judgment is reversed, and the case is remanded to the district court with instructions to enter judgment in favor of Crane and the union. The cross-appeal is dismissed as moot.

A true copy.

Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.